UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOAN BURKE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:10CV588 CDP |
| | ) |
| CURTIS SULLIVAN, et al., | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

In this § 1983 case Joan Burke claims that defendant police officers violated her rights under the Fourth Amendment when they entered her home without a warrant and briefly detained her. Burke filed a motion seeking summary judgment on liability, and the officers filed a motion seeking summary judgment on qualified immunity grounds. Because the undisputed evidence shows that the officers were justified in entering Burke's home and briefly detaining her, they are entitled to summary judgment. I will therefore grant their motion.

## Undisputed Facts[1]

On June 27, 2009, Burke's son, who lived with her, attended a party hosted by her neighbors across the street. Burke's son became highly intoxicated at the

---

[1] Plaintiff admitted that the facts set out in support of defendant's motion for summary judgment were true, so this description is based on that statement of undisputed facts and those facts set out by the plaintiff that defendants do not dispute.

party and may have also been under the influence of illegal drugs. He became disruptive, so the hosts asked him to leave. He refused, stating that he was afraid the police would get him if he left and that he did not want to go back to jail.[2] After passing out from intoxication or falling asleep, Burke's son jumped up, began yelling, ripped off his shirt and threw it, and threatened to beat everyone up. He then threw a liquor bottle and another object across the room, and continued to refuse requests to leave.

Burke, who had been awakened by a power outage, heard people outside talking loudly and heard her son's name. When she went outside Burke saw one of the neighbors, who told her about the problems with her son and asked her to speak to him. She entered the neighbors' house to do so and saw other people telling her son to leave. She also asked him to come home, but he refused. Burke grabbed her son's arm, but he twisted away, causing her to fall backwards and hit her head on a wall. She then went home. Another person approached the son and attempted to drag him out of the house. A struggle ensued; Burke's son bit the other man two to four times, drawing blood. He kicked or punched a table, breaking it. At some point during the struggle, someone called the police. Before the police arrived, Burke's son ran across the street and into Burke's home.

---

[2]This occurred before any police involvement.

Officers Curtis Sullivan, Robert Bell, and Andrea Nack of St. Charles County arrived on the scene at 12:48 a.m., only four minutes after the 911 call. The neighbors and partygoers told the officers the following about the events that occurred after Burke came over: Burke tried to get her son to leave, but he refused and shoved her against a wall. She was not injured. Before Burke left the neighbors' home she told one of the partygoers to do whatever he needed to do in order to get her son to leave. It was at that time that the struggle ensued and Burke's son bit another partygoer. He also broke a table leg that had been being held to the table with glue. Some of the partygoers eventually got him outside of the neighbors' home, and he ran into Burke's home just before the officers arrived.

One of the officers observed the scene of the party and concluded that the home was a "disaster." Specifically, the bottle that Burke's son had thrown was on the floor, the table was broken, liquids were spilled on the floor, and other items were on the floor in the kitchen. A partygoer told the officers that the state of the home resulted from the disturbance involving Burke's son, rather than from the party itself. An officer also observed and bandaged the bite Burke's son had inflicted on one of the partygoers. Despite the mess, one of the neighbors told the officers that he did not wish to press charges because he feared retaliation by Burke's son.

After questioning the neighbors and partygoers, the officers discussed the possibility that Burke might be in some sort of danger or injured and that her son was still at her home. They crossed the street and knocked loudly on Burke's front door, announcing their presence, but they received no answer. They could hear noise in the home. They asked a dispatcher to attempt to contact Burke's home by telephone; dispatch reported that there was no answer.

The officers then went around to the back of Burke's home. They again knocked, announcing their presence and shined their flashlights into the home, but there was still no answer. The inner rear door was open, but the outer storm door, although unlocked, was closed. The officers then entered the home, without a warrant, calling out "sheriff's department, sheriff's department ..." Burke first answered from upstairs at approximately 1:00 a.m., which was about 12 minutes after the officers arrived at the neighbors' home. She cursed at the officers, asking whether they were in her home and if so, why. When asked to put down any weapons, Burke said, "I don't have any weapons, but I have a 100 pound dog that I'm struggling to hold onto." Each of the officers interpreted Burke's statement as a threat to release the dog on them. One of the officers told Burke that if she released the dog he would shoot it. Burke then put the dog away and came down the stairs with her hands up. She saw the officers pointing guns at her. Once the

officers saw she was unarmed, they placed their weapons back in their holsters. The officers told Burke they were there to check on the well-being of her and her son. Burke asked the officers whether they had a warrant, and told them that she worked at a law firm. As soon as the officers determined that Burke was not in need of assistance, and Burke asked them to leave, they left. The officers relied on Burke's statement that her son was upstairs passed out, but did not physically see him. It was approximately 1:03 a.m. when one of the officers contacted their supervisor from outside Burke's home, making the officers' interaction with Burke less than two minutes.

### Discussion

Qualified immunity is a question of law, *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005), and thus it is appropriately resolved on summary judgment, *see Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). In determining whether the officers are entitled to qualified immunity, I must consider two questions: (1) whether the facts as shown, construed in the light most favorable to Burke, establish that the officers violated her constitutional or statutory rights, and (2) whether the rights were clearly established at the time of the incident, such that a reasonable official would have known that his or her actions were unlawful. *See Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808,

815-16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 129 S. Ct. at 818. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Under the Fourth Amendment, individuals have a right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). But, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" that presumption can be rebutted by establishing an exception to the warrant requirement, such as the exception for exigent circumstances. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "Exigent circumstances include threats to an individual's life, a suspect's imminent escape, the imminent destruction of evidence, or situations where 'there is a compelling need for official action and there is no time to secure a warrant.'" *Radloff v. City of Oelwein*, 380 F.3d 344, 348 (8th Cir. 2004). For example, "legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches." *United States v. Janis*, 387 F.3d 682, 687 (8th

Cir. 2004) (internal citations and quotations omitted). Whether exigent circumstances exist is an objective inquiry, so the subjective motivation of the officer is irrelevant. *Brigham City*, 547 U.S. at 404 (internal citation omitted).

The officers argue that their actions are covered by two examples of the exigent circumstances exception to the warrant requirement: the emergency aid exception and the community caretaker exception. The emergency aid exception applies where officers need to assist a person who is "seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403. "The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Id.* at 406. As such, once an officer observes violence, nothing in the Fourth Amendment requires him or her to wait until another blow renders someone unconscious or semi-unconscious. *Id*. And evidence that a violent suspect is present and threatening others is sufficient to justify entry into a dwelling to prevent violence and restore order. *United States v. Spotted Elk*, 548 F.3d 641, 652 (8th Cir. 2008). "Officers do not need ironclad proof of a 'likely serious, life-threatening'" injury to invoke the emergency aid exception, and whether an emergency actually existed, in hindsight, is irrelevant to the subjective analysis. *Michigan v. Fisher*, 130 S.Ct. 546, 549 (2009).

The community caretaker exception applies only where an officer is acting

in his or her community caretaker function, i.e., helping those in danger or protecting property, *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006), and only requires a reasonable belief that an emergency exists requiring his or her attention, *id.* at 1007 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978)). The reasonable belief standard is less exacting than the probable cause requirement for an officer "acting to investigate and uncover crime," which is "at the core of his or her duties[.]" *Id*. (quoting *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990)). And when officers have reason to believe that someone is home but not answering the door it may be reasonable to believe that person may be unable to respond for some reason. *Quezada*, 448 F.3d at 1008.

The facts known to the officers at the time they entered Burke's home provided a reasonable basis for their legitimate concern for Burke's safety. The officers entered Burke's home in their emergency aid or community caretaker capacity, evidenced by their conversation about the possibility that Burke may be injured and by their statements to Burke that they were there to check on her and her son's well-being. The officers were responding to a reported disturbance. They had information that Burke's son was intoxicated, was possibly under the influence of illegal drugs, had broken and thrown things at his neighbors' home, had been violent with other partygoers, had been violent with Burke, and had prior

in his or her community caretaker function, i.e., helping those in danger or protecting property, *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006), and only requires a reasonable belief that an emergency exists requiring his or her attention, *id.* at 1007 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978)). The reasonable belief standard is less exacting than the probable cause requirement for an officer "acting to investigate and uncover crime," which is "at the core of his or her duties[.]" *Id*. (quoting *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990)). And when officers have reason to believe that someone is home but not answering the door it may be reasonable to believe that person may be unable to respond for some reason. *Quezada*, 448 F.3d at 1008.

The facts known to the officers at the time they entered Burke's home provided a reasonable basis for their legitimate concern for Burke's safety. The officers entered Burke's home in their emergency aid or community caretaker capacity, evidenced by their conversation about the possibility that Burke may be injured and by their statements to Burke that they were there to check on her and her son's well-being. The officers were responding to a reported disturbance. They had information that Burke's son was intoxicated, was possibly under the influence of illegal drugs, had broken and thrown things at his neighbors' home, had been violent with other partygoers, had been violent with Burke, and had prior

issues with law enforcement. Although the officers did not see ongoing violence, it was reasonable for them to believe that the violence that occurred at the neighbors' home could have continued at the Burke residence. The officers knew that Burke was inside the home with a violent subject who had just assaulted her, and that there was movement in the home yet no response to the officers' repeated knocking and announcing. Under these facts, the officers were justified in entering the home without a warrant under either the emergency aid exception or the community caretaker exception.

Burke questions whether the officers' true motive was to check on the well-being of her son because the officers never actually saw him. The officers' subjective motives, however, are not relevant to the inquiry. Further, the undisputed facts show that the officers did not enter the home to conduct a criminal investigation, because they left without seeing or speaking to Burke's son. The officers relied on Burke's statements about her son and honored her request to leave once they saw she was not in need of assistance. The fact that no emergency actually existed is also irrelevant to this subjective inquiry.

Burke attempts to analogize this case to the domestic violence case of *Smith v. Kansas City*, 586 F.3d 576 (8th Cir. 2009), but in *Smith*, the court found that entry into a home was not per se lawful simply because a domestic violence

suspect was present in the home with a child, *id.* at 580. In that case, the victim was not present at the scene. *Id*. Here, Burke was present in the home with her son, and she was a victim of his violence. Because the officers did not violate Burke's Fourth Amendment rights by entering her home without a warrant, the officers are entitled to qualified immunity as a matter of law.

Additionally, the ninety-second detention[3] of Burke once the police entered the house did not violate her constitutional rights. This minimal detention was justified by the officers' need to secure the scene. Again, evidence that a violent suspect is present and threatening others is sufficient to justify entry into a dwelling to prevent violence and restore order. *Spotted Elk*, 548 F.3d at 652. "When police have lawfully entered the home in response to exigent circumstances, they may conduct a protective sweep, or cursory inspection of places where a person might be, if the facts would justify a reasonable officer believing that there might be someone dangerous in the home." *Id*. at 651. Further, the community caretaker exception carries with it the right to seize an individual, regardless of any suspected criminal activity, where the governmental

---

[3]The complaint alleges that this was an "arrest," but Burke's briefs claims it should have been alleged to be "an arrest or seizure." The undisputed facts show she was not arrested, but even a temporary investigative detention such as this is a seizure under the Fourth Amendment. *Terry v. Ohio*, 329 U.S. 1, 16-19 (1968).

interest in a police officer's exercise of his or her community caretaker function outweighs the individual's interest in being free from arbitrary government interference. *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir 2005). It follows that where the protective sweep of a home is justified under the community caretaker exception to the warrant requirement, the temporary detention of the occupants of the home is also justified.

Here, the officers had evidence that a violent suspect was in the home, that one of his victims was also in the home, and that despite movement in the home no one was answering their loud knocks, shouts, and shining of flashlights into the home. Once they lawfully entered the home under an exception to the warrant requirement, their interest in ensuring their safety and the safety of others outweighed Burke's interest in being free from this minimal detention. Although the officers initially had their guns drawn, they placed their guns back in their holsters after determining that Burke was unarmed. The manner in which the officers maintained control was not unreasonable, and it was of very short duration.

Accordingly,

**IT IS HEREBY ORDERED** that the defendants' motion for summary judgment [#22] is granted, and plaintiff's motion for summary judgment [#16] is

denied.

A separate judgment in favor of defendants is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of July, 2011.